AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

MAY 17 2023

MITCHELL R. ELFERS
CLERK OF COURT

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

207 Dagger Rd., Carlsbad, NM 88220

)
)
)
)
)
)

Case No. 23MR1034

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and incorporated herein.

located in the                District of        **New Mexico**              , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 | Possession with Intent to Distribute a Controlled Substance |
| 21 U.S.C. 846 | Conspiracy to Possess with Intent to Distribute a Controlled Substance |
| 18 U.S.C. 924(c) | Possession of firearms in furtherance of a drug trafficking crime |

The application is based on these facts:

See Attachment C, attached and incorporated herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of         days *(give exact ending date if more than 30 days          )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

**HSI Special Agent Daniel J. Ortiz**
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
electronic submission and telephonic swearing   *(specify reliable electronic means)*.

Date: 5/17/2023

*Judge's signature*

City and state:   Roswell, New Mexico

**Barbara S. Evans, United States Magistrate Judge**
*Printed name and title*

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

The premises to be searched (the "Subject Premises") is located at 207 Dagger Rd., Carlsbad, NM 88220. The Subject Premises is a single-wide trailer with a brown added structure to the south of the trailer. The trailer is white with a white roof.   There are big windows and a door that faces to the north. There are multiple vehicles parked to the east of the residence. There is a white detached garage to the south of the main structure.  The property is surrounded by a white rusted pipe fence.

To include all outbuildings and appurtenances on the property, and all vehicles on the property associated with Manuel Montoya, specifically including a white 2004 Chevrolet Suburban with New Mexico license plate DGJ379.

Below are pictures of the Subject Premises and pictures of the white Chevy Suburban parked in front of the residence of the Subject Premises.



Page 1 of 4



Page **2** of **4**





### *ATTACHMENT B*

### *ITEMS TO BE SEIZED*

Evidence of violations of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 924(c) by Manuel Montoya and his co-conspirators, including:

1. Any cellular telephones, digital tablets, personal digital assistant (PDA) devices or other communication devices and any and all information stored on such communication devices, including:

   a. Phone numbers, names, usernames, email addresses, residential addresses, and other identifying information of customers, distributors, sources of supply, and other associates of the user of the communication devices;

   b. Audio and video calls made to or from the communication devices, along with the duration and date and time each such communication occurred;

   c. Any message logs or messages, whether sent from, to, or drafted on the communication devices, along with the date and time each such communication occurred;

   d. The content of voice mail messages and audio and video messages stored on the communication devices, along with the date and time each such communication occurred;

   e. Photographs or video recordings;

   f. Information relating to the schedule, whereabouts, or travel of the user of the communication devices;

   g. Information relating to other methods of communications, including the contents of those communications, utilized by the user of the communication devices and stored on the communication devices;

   h. Bank records, checks, credit card bills, account information and other financial records; and

   i. Evidence of user attribution showing who used or owned the communication devices, such as social media accounts, email addresses, messages, location information, photographs and videos, phonebooks, saved usernames and passwords, documents, and internet browsing history;

2. Records relating to the importation, distribution, and possession of controlled substances, including, but not limited to books, records, receipts, cell phones, cell phone records,

notes, ledgers, notebooks, border crossing documents, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances including but not limited to cocaine;

3. Papers, tickets, notes, schedules, receipts including bill of sales for vehicles, registration and licensing of vehicles, license plates, vehicle titles, registration, documents, stickers, and other proof of ownership and tax compliance, driver's license, or proof of insurance and liability;

4. Financial documents, including but not limited to, credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union receipts, checking account records, cashier's checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money or assets;

5. Identification and personal records including address books, telephone directories, calendars, diaries, social security cards, lists of names, social security numbers and other personal identification, telephone and address books or papers of individuals involved in the trafficking of controlled substances;

6. Photographs, video recordings, slides, digital files, DVDs, CD-Rs, or other media containing images or video of individuals involved in the trafficking of controlled substance which demonstrate his/her involvement in drug trafficking as well as other notes, records, diaries, journals, emails, blog entries, which demonstrate involvement in drug trafficking;

7. Proceeds of an unlawful activity, including but not limited to, United States currency, jewelry, vehicles and other assets or financial records related thereto;

8. Documents, books and papers reflecting names, addresses and/or telephone numbers and lists pertaining to individuals involved in the trafficking of controlled substances, including but not limited to cocaine;

9. Diaries, purchase records, cash receipts and disbursement journals, inventory records and other records relating to the operation of controlled substance sales, repackaging, and redistribution in violation of 21 U.S.C. 841 and 846;

10. United States currency, currency counting machines, precious metals, jewelry, financial instruments including stocks and bonds, and all other items of value, and all sales receipts for items of value, that evidence the proceeds from the smuggling, transporting or distribution of drugs.

11. Devices or objects utilized to account for proceeds related to violation of violation of 21 U.S.C. §§ 841 and 846, including but not limited to currency counting machines;

12. Controlled substances, drug paraphernalia, and packaging materials, including scales, plastic baggies, vacuum sealing machines, and tape;

13. Firearms and ammunition as defined by Title 18 USC Section 921;

14. Valid or false identification documents, including drivers' licenses, social security cards, state identification cards and foreign identification documents;

15. Bills, notes, contracts, or other documents reflecting the ownership, subscription information or use or control of one or more telephones or the location to be searched;

16. Tools utilized in the alteration of motor vehicles to facilitate transporting narcotics in violation of 21 U.S.C. §§ 841 and 846; and

17. Safes, lock boxes, or other locked containers, in which the items in paragraphs 1 through 16 could be concealed.

ATTACHMENT C

AFFIDAVIT IN SUPPORT OF ORDER AUTHORIZING
SEARCH WARRANT

I, Daniel J. Ortiz, being first duly sworn, hereby depose and state as follows:

1.  This Affidavit is submitted in support of an order authorizing the entry into the Subject Premises, as more fully described below and in Attachment A to the Search Warrant Application, for the purposes of searching and seizing evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 (distribution and possession with intent to distribute a controlled substance and conspiracy to do the same) and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime).

INTRODUCTION

2.  I am a Special Agent with the Department of Homeland Security, United States Immigration and Customs Enforcement, Homeland Security Investigations (HSI) assigned to the Assistant Special Agent in Charge Office, Las Cruces, New Mexico. I am classified, trained, and employed as a federal law enforcement officer with statutory arrest authority and charged with conducting criminal investigations of alleged violations of federal criminal statutes, including Title 8, Title 18, Title 19, and Title 21 of the United States Code. As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been employed as a Special Agent since December 2009. Prior to being employed as a Special Agent with HSI, I was employed as a U.S. Customs and Border Protection (CBP) Officer from October 2002 to December 2009. As a CBP Officer I performed a wide range of customs and immigration enforcement duties, such as controlled substance seizures, intellectual property rights violations, and immigration investigations.

3.  I have received training and am experienced in the investigations of violations of the federal drug trafficking and money laundering laws. As a result, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs, and to hide profits generated from those transactions. I also have experience in analyzing and interpreting coded dialogue and communications used by drug traffickers. My experience as a narcotics agent includes, but is not limited to: conducting physical surveillance, interviewing witnesses, writing affidavits for and executing search warrants, working with undercover agents and informants, issuance of administrative and federal grand jury subpoenas, analysis of phone toll and financial records, and analysis of data derived from the use of pen registers, and trap and traces, and wiretaps.

4.  Through my training and experience, I know the following:

   a.  Drug traffickers commonly keep books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances.

   b.  Drug traffickers often amass large amounts of profits derived from their illegal drug trafficking activities. Documents and other records pertaining to assets which are proceeds of the drug trafficking described herein would constitute evidence of the same drug trafficking.

   c.  Drug traffickers often maintain large amounts of U.S. currency derived from illegal activities.

   d.  Drug traffickers often maintain ledgers, account books, and other papers detailing the receipt, storage, sale and distribution of drugs. These ledgers often contain amounts of drugs obtained by the organization, and accounting of payments of drug proceeds, including accounts receivable and accounts payable.

e.  Drug traffickers often maintain phone books, address books and other papers containing names, telephone numbers, and addresses of suppliers and purchasers of drugs. Drug traffickers will often write these documents in code and they maintain documents containing the key to their codes.

f.  Drug traffickers also often maintain documents or receipts for various services, such as bank statements, telephone bills, utility bills, vehicle repair, consumer goods purchases, all evidencing the disposition of illegal profits, the existence of "stash houses," and the existence of other assets derived from drug proceeds. Drug traffickers often maintain various documents evidencing ownership of assets such as real estate deeds, vehicle titles, and insurance policies.

g.  Drug trafficking is a "for profit business" and, as such, traffickers must maintain the types of documents described above so as to determine profitability and to track debts owed by and to the trafficker.

h.  Drug traffickers often keep photographs and videos of themselves and their co-conspirators, drugs, and their illegal profits.

i.  Drug traffickers often use surveillance cameras in and around their residences and locations where drugs are stored to detect law enforcement and to protect drugs and drug proceeds. These surveillance cameras can be capable of storing footage within the camera or on a separate storage device.

j.  Drug traffickers often maintain safes or deposit boxes where they store drugs, U.S. currency and other documents evidencing their drug trafficking. It is common knowledge that safe deposit boxes require the owner to keep the key to the safe deposit box.

k. Drug traffickers often have in their possession firearms and ammunition to protect themselves, their drugs, and the proceeds derived from the distribution of drugs from individuals who seek to rob them or from competing drug traffickers.

l. Drug traffickers often maintain one or more cellular or "smart" telephones ("devices") which they utilize to further their drug trafficking. Drug traffickers use these devices to communicate operational directives and information concerning the conduct of the organization's illegal activities to other organization members, including their suppliers, distributors and other co-conspirators. I know, based upon my training and experience, that timely communication of information between organizational members is critical to the overall success of an organization's illegal activities. The critical nature of this information is derived from the necessity of the organization's management to provide instructions for the importation, storage, transportation, and distribution of drug, as well as the subsequent laundering of the proceeds of these illegal activities.

m. I also know that some devices utilize subscriber identity module ("SIM") cards. A SIM card is a chip that is used to authenticate a device to a network. The SIM card generally contains subscriber information and authentication information, and it may contain contacts and encryption information. The portability of SIM cards in some devices allows a user to easily change devices. while maintaining the same telephone number. by removing the card from one device and inserting it into another. While SIM cards may have the capability to store some of the evidence described above, the storage capacity of devices tends to far exceed that of SIM cards. Which information is stored on the SIM card, on the device, or in both locations varies and depends on variables such as the user-defined settings on the device and the memory capacity of the SIM card. Accordingly,

information pertaining to drug trafficking activity may be located on the SIM card itself, as well as the device in which the SIM card was inserted.

n.  I further know from my training and experience that a cache of information including dialed, received or missed calls and messages sent, received or placed in draft status, can be found on these devices.  I know that the identities and telephone numbers of other participants in the drug trafficking activity are maintained in the contact lists of these devices.  In my experience, drug traffickers also use these devices to take and store photographs or video recordings of themselves with their co-conspirators and with contraband, including drugs, currency and firearms.  Drug traffickers also use the GPS or location applications of these devices, which can reveal their whereabouts when they conducted or arranged drug related activities or travel.  In addition, drug traffickers also use these devices to store information related to the financial transactions that occur during the course of their drug trafficking, such as drug ledgers and financial accounts and transactions.  In my experience, the devices used by drug traffickers often contain evidence relating to their drug trafficking activities, including, but not limited to, contact lists, lists of recent call activity, stored text and voice mail messages, photographs and video recordings, GPS and location information, and financial accounts and records.  Information stored within a mobile device may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element, or, alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a mobile device (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and

malware detection programs) can indicate who has used or controlled the mobile device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. Information stored within a mobile device may provide relevant insight into the device user's state of mind as it relates to the offense under investigation.  For example, information within the mobile device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the mobile device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

o.  Drug traffickers often maintain drugs, drug proceeds, ledgers and other documents related to drug trafficking, and firearms, in their primary residence or place of business and in their vehicles to afford them ready access to those items.

p.  Drug traffickers often conceal drugs, drug proceeds, firearms, and ammunition on the curtilage of their property, including buried underground and inside of vehicles, garages, storage sheds, and other unattached buildings, in order to prevent law enforcement or individuals who seek to rob them from discovering such items.

q.  Drug traffickers often place ownership of vehicles, real estate, telephones and other assets in nominee names and register utility services in nominee names to avoid law enforcement detection.

<u>Subject Premises</u>

5.  The following information is based upon my personal knowledge, as well as information provided by other federal officers and is presented as probable cause to seek issuance of a search warrant allowing agents to enter and conduct a search of a property located at 207 Dagger Rd.,

Carlsbad, NM 88220 (the Subject Premises), more fully described in Attachment A, which is the residence of Manuel Montoya. Based on surveillance of Montoya over the past several weeks, agents are aware that Montoya lives at the Subject Premises.

Probable Cause

6. This Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Facts presented in this Affidavit are based on my knowledge, observations, and direct participation in this investigation, as well as through conversations with other agents and/or persons involved in the investigation, and through the review of reports, and other documentation generated by myself and others during the course of this investigation and other related investigations.

7. The following information is presented as probable cause to search the Subject Premises. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every known fact regarding the instant investigation. More specifically, I have set forth only pertinent facts that I believe are necessary to establish probable cause to search the Subject Premises for evidence of violations of 21 U.S.C. §§ 841(a)(1) and 21 U.S.C. §846 and 18 U.S.C. § 924(c).

8. Beginning in early 2023, agents received information from a confidential source (CS) about Manuel Montoya's drug trafficking activities. The CS advised Montoya was distributing large amounts of methamphetamine, cocaine, and fentanyl in Carlsbad and Artesia, New Mexico (NM), and the surrounding areas.

9. Based on that information, in April 2023, the CS telephonically negotiated with Montoya to purchase one pound of methamphetamine and 1,000 fentanyl pills. After coordinating the amount, the CS met Montoya in Artesia, NM. During the transaction, surveillance agents

observed Montoya arrive at the meet location in a white Chevrolet Suburban. Upon arriving, the

CS got into the passenger seat of Montoya's vehicle. While in the vehicle, Montoya provided the

CS with one bundle wrapped in clear plastic covering containing approximately .5 kilograms

(gross weight) of a clear crystal-like substance and one clear plastic Ziploc baggie containing

approximately 186.8 grams (gross weight) of blue oval shaped pills with "M" inscribed on one

side and "30" inscribed on the other. In exchange for the methamphetamine and fentanyl pills,

the CS provided Montoya with $4,000 of U.S. Currency. Following the transaction, the clear

crystal-like substance field tested positive for the properties and characteristics of

methamphetamine.

10. In May 2023, the CS again telephonically negotiated with Montoya to purchase one pound of

methamphetamine and 1,000 fentanyl pills. During the conversation, Montoya told the CS that

he did not currently have fentanyl pills but that he had additional methamphetamine. Montoya

agreed to sell the CS two pounds of methamphetamine for $4,400. After agreeing on the amount

and price, the CS met with Montoya at Montoya's residence in Carlsbad, NM. While at

Montoya's residence, Montoya provided the CS with one bundle wrapped in clear plastic

covering containing a clear crystal-like substance and one Ziploc baggie concealed in a clear

plastic heat seal bag containing a clear crystal-like substance. The two packages weighed

approximately 1.0 kilograms (gross weight).  In exchange for the methamphetamine, the CS

provided Montoya with $4,400 of U.S. Currency. Following the transaction, the clear crystal-like

substances in both packages field tested positive for the properties and characteristics of

methamphetamine.

11. On May 7, 2023, agents with DEA received information that Montoya was traveling from

Albuquerque, NM to Carlsbad, NM, with what agents believed to be a significant amount of

fentanyl pills. Based on that information, agents, with the assistance from GPS location data on Montoya's cell phone, confirmed that Montoya was traveling back to Carlsbad, NM. At approximately 8:30 p.m., agents established surveillance along Highway 285 in Roswell, NM in an attempt to intercept Montoya. Agents believed that Montoya was driving a white Chevrolet Suburban bearing New Mexico license plate DGJ379, which Montoya had previously used when Montoya sold drugs to the CS in April 2023. At approximately 9:26 p.m., surveillance agents located the white Chevrolet Suburban traveling south through Roswell, NM. At approximately 11:34 p.m., as Montoya entered Eddy County, an Eddy County Sheriff's Office (ECSO) Deputy and a Carlsbad Police Department (CPD) Officer conducted a traffic stop on the vehicle. During the traffic stop, Montoya and three other individuals were located inside the vehicle. A CPD K-9 was utilized to conduct an open-air sniff of the vehicle. During the sniff, the K-9 alerted to the presence of narcotics inside the vehicle. During a subsequent search, law enforcement located, inside a suitcase and nylon bag in the back-compartment area of the vehicle, six Ziploc baggies containing approximately 3.8 kilograms (gross weight) of blue oval shaped pills with "M" inscribed on one side and "30" inscribed on the other. Law enforcement also located approximately 30 grams of a clear crystal-like substance - methamphetamine, two handguns, and $11,721 in United States Currency from inside the vehicle. In order to further the investigation, Montoya and all passengers were released.

12. On May 10, 2023, agents with DEA again received information that Montoya would be traveling from Albuquerque, NM to Carlsbad, NM, with what agents believed a distributable amount of drugs. Agents also learned that Montoya was driving a BMW 328i car. Based on that information, agents, with the assistance from GPS location data on Montoya's cell phone, confirmed that Montoya was in Albuquerque, NM. Agents continued to monitor his location

throughout the evening hours of May 10, 2023, and into the early morning hours of May 11, 2023. At approximately 2:33 a.m., based on GPS location data, agents confirmed that Montoya had left Albuquerque and was traveling in the direction of Carlsbad, NM. Based on that information, agents established surveillance along Highway 285 north of Roswell, NM. At approximately 4:04 a.m., surveillance agents located the BMW as the vehicle was traveling south on Highway 285 into Roswell, NM. Surveillance agents followed the vehicle as it continued to travel south towards Carlsbad, NM. At approximately 5:07 a.m., as the vehicle entered Eddy County, NM, ECSO and CPD conducted a traffic stop on the vehicle. During the traffic stop, Montoya was identified as the driver of the vehicle, and there was one adult male passenger. A CPD K-9 conducted an open-air sniff of the vehicle. During the open-air sniff, the K-9 alerted to the presence of narcotics inside the vehicle. During a subsequent search of the vehicle, law enforcement located and seized approximately 1,782 grams of methamphetamine, 80 grams of cocaine, 2.2 grams of fentanyl powder, 212 grams of fentanyl pills, and 1180 grams of high-grade marijuana from two hard cases in the trunk area of the vehicle. Law enforcement also located one stolen handgun underneath the passenger seat. Montoya and his passenger were both released in order to further the investigation.

13. On May 15, 2023, agents with DEA once again received information that Montoya would be traveling from Albuquerque, NM to Carlsbad, NM with a large amount of methamphetamine. Based on that information, agents, with the assistance from GPS location data on Montoya's cell phone and surveillance agents in Albuquerque, confirmed that Montoya was in Albuquerque, NM. During surveillance, agents located Montoya and his BMW at a smoke shop in Albuquerque. After leaving the smoke shop, agents attempted to follow Montoya but were unsuccessful as Montoya conducted "heat runs," which is where an individual makes multiple

turns, slows down and speeds up, switches lanes, and drives into and out of parking lots in order to see who is following them, specifically law enforcement. However, Montoya's location was continued to be monitored through GPS location data. Agents were able to confirm that Montoya was traveling south on I-25 out of Albuquerque. Montoya then began to travel west on Highway 380. As Montoya began to travel on Highway 380, surveillance agents again located his BMW. Agents maintained surveillance of Montoya as Montoya pulled into a gas station in Carrizozo, NM. While at the gas pump, law enforcement contained Montoya's vehicle and arrested him with out incident. During a subsequent search of the vehicle, agents located a clear crystal-like substance inside a purple bag that was inside a cardboard box. The clear crystal-like substance weighed approximately 5.5 kilograms (gross weight) and later field tested positive for the properties and characteristics of methamphetamine.

14. During a post-arrest interview, Montoya admitted to picking up the methamphetamine that was located inside the trunk of his BMW in Albuquerque, NM. Montoya was unsure the exact amount but knew it was methamphetamine. Montoya also admitted to picking up the methamphetamine and fentanyl from the May 7, 2023, and May 10, 2023, incidents.

15. On May 17, 2023, in a recorded call from the jail, Montoya was talking to his sister, and instructed his sister to get into the "Suburban" that is at the Subject Premises. Montoya told his sister that the Suburban contained all of Montoya's important paperwork and that there was something in the back of the vehicle that Montoya's sister needed to get out of the vehicle. Montoya's sister said that she did not have the key to the vehicle, and she said that a female friend of Montoya's had already taken things from the vehicle. Montoya responded in a dejected manner (in Spanish), "it was like 30,000 bucks." Based on this conversation, I believe that Montoya was telling his sister that there was either $30,000 in cash or $30,000 worth of drugs in

the 2004 white Chevrolet Suburban that is currently parked at the Subject Premises. While
Montoya's sister appears to believe that the female friend had already taken anything of value
from the vehicle, I believe that there is still probable cause to believe that there is evidence of a
crime in the vehicle and in the Subject Premises, which is Montoya's residence.

## ELECTRONIC STORAGE & FORENSIC ANALYSIS

16. Based on my knowledge, training, and experience, I know that electronic devices can store
    information for long periods of time. This information can sometimes be recovered with
    forensics tools.

17. *Forensic evidence.* As further described in Attachment B, this application seeks permission to
    locate not only electronically stored information that might serve as direct evidence of the crimes
    described on the warrant, but also forensic evidence that establishes how any seized cellular
    telephone or other electronic device was used, the purpose of its use, who used the Device, and
    when. There is probable cause to believe that this forensic electronic evidence might be on the
    devices because:

    a. Forensic evidence on a device can also indicate who has used or controlled the device.
       This "user attribution" evidence is analogous to the search for "indicia of occupancy" while
       executing a search warrant at a residence.

    b. A person with appropriate familiarity with how an electronic device works and the data
       generated by such devices may, after examining this forensic evidence in its proper context,
       be able to draw conclusions about how electronic devices were used, the purpose of their
       use, who used them, and when.

    c. The process of identifying the exact electronically stored information on a storage medium
       that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence

is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

18. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

## Conclusion

19. Based on the foregoing, I submit that this Affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A and seize evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 (distribution and possession with intent to distribute a controlled

substance, and conspiracy to do the same) 18 U.S.C. § 924(c) (possession of a firearm in

furtherance of a drug trafficking crime).

Respectfully submitted,

Daniel J. Ortiz
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this
17th day of May 2023.

Barbara S. Evans
United States Magistrate Judge